**Corrado M. BAGLIO, Plaintiff,**

v.

**John BASKA, Camillo A. Bonomi, Steven Brodsky, Julia Brush, Emlyn Charles, Deca Labs, Inc., Frank Delisi, Charles Delman, Dante Dimarzio, William B. Donatelli, George Ehringer, Donald Fox, Edward Heinle, Robert Hersch, Joseph Klag, Med–Check Laboratories, Inc., Medical Center Enterprises, Inc., John Notaro, Gino Piroli, Kuldeep Sehgal, Narayan Shetty, Jose Sia, Amarjeet Singh, William Slemenda, Patrick Strum, Nicholas Tapyrik, Pradip Teredesai, The Medical Center of Beaver, Inc., Harold Thomas, Howard W. Vanscoy, Jr., Richard Wood, Woodlawn Health Resources, Inc., Woodlawn Technologies, Inc., Michael Zernich, Stephen Zernich, Jr., Wallace Zernich, Marian Zinkham, Defendants.**

Civil Action No. 91–1937.

United States District Court, W.D. Pennsylvania.

Aug. 28, 1996.

John M. Silvestri, Pittsburgh, PA, for Plaintiff Baglio.

Wendelynne J. Newton, Gregory A. Miller, Buchanan Ingersoll, Pittsburgh, PA, for Defendants Buska, Deca Labs, Inc., Heinle, Hersch, Med Center Entrp., Med. Center of Beaver, Inc.

Ronald J. Rademacher, Wick, Streiff, Meyer, Metz & O'Boyle, Pittsburgh, PA, Albert A. Torrence, John P. Dohanich, Rowley, Smith & Lewis, P.C., Ambridge, PA, for Defendants Bonomi, Brodsky, Brush, Charles, Delisi, Delman, Dimarzio, Donatelli, Ehringer, Fox, Klag, Notaro, Piroli, Sehgal, Shetty, Sia, Singh, Slemenda, Strum, Tapyrik, Teredesai, Thomas, Vanscoy, Wood, Woodlawn Health Resources Inc., Woodlawn Technologies, Inc., M. Zernich, S. Zernich, Zinkham.

John M. Giunta, Pittsburgh, PA, for Defendant Slemenda.

Francis C. Rapp, Jr., Feldstein, Grinberg, Stein & McKee, Pittsburgh, PA,

Joseph D. Talarico, Talarico, Paladino, Talarico & Berg, Pittsburgh, PA, for Defendant Med–Check Labs Inc.

George M. Weis, Weis & Weis, Pittsburgh, PA, for Defendants Strum, Tapyrik.

Edward A. Yurcon, Pittsburgh, PA, for Defendants M. Zernich, S. Zernich.

### · OPINION

COHILL, Senior District Judge.

Plaintiff Corrado M. Baglio, M.D. is the former director of the pathology laboratory at Aliquippa Hospital, located in the city of Aliquippa, Beaver County, Pennsylvania. His termination from that position has spawned eight years of litigation in both the state and federal courts. In the action presently before this Court, Dr. Baglio has alleged antitrust violations under the Sherman Antitrust Act, 15 U.S.C. § 1, and the Clayton Act, 15 U.S.C. § 3, as well as violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d). The precise nature of these claims will be addressed below. The defendants in this action are 37 corporations and individuals, including hospital employees, board members, administrators, and physicians.

The defendants have aligned themselves into four groups, and each has filed a motion for summary judgment with accompanying brief. Defendants The Medical Center of Beaver ("TMC"), DECA Labs, Medical Center Enterprises ("MCE"), John Baska, M.D., Edward Heinle, M.D., and Robert Hersh (the "Medical Center Defendants") have filed a motion for summary judgment docketed at Doc. 117. The motion filed by Steven Brodsky, M.D.; Dante DiMarzio, D.O.; Joseph Klag, D.O.; John Notaro, M.D.; Kuldeep Sehgal, M.D.; Narayan Shetty, M.D.; Jose Sia, M.D.; Amarjeet Singh, M.D.; William Slemenda, M.D.; Patrick Sturm, M.D.; Nicholas Tapyrik, M.D.; Pradip Teredesai, M.D.; Harold Thomas, M.D.; Michael Zernich, M.D., Stephen Zernich, Jr., M.D.; and Wallace Zernich, M.D. (the "Physician Defendants") is docketed at Doc. 108. A third group of defendants includes Camillo A. Bonomi, Julia Brush, Emlyn Charles, Frank DeLisi, Charles Delman, William B. Donatelli, George Ehringer, Donald Fox, Gino Piroli, Howard W. VanScoy, Jr., Richard Wood, Woodlawn Health Resources, Inc., Woodlawn Technologies, Inc., and Marian Zinkham (the "Administrative Defendants"). The individuals in this group either were (and in some instances may remain) on the Board of Directors of Woodlawn Health Resources or Woodlawn Technologies, or were administrators at Aliquippa Hospital at all relevant times. Their motion for summary judgment is docketed at Doc. 106. The final defendant to this action, Med–Check Laboratories, Inc. ("Med–Chek"), has moved for summary judgment in Doc. 115. Plaintiff has filed a three-volume response, as well as affidavits and a memorandum of law addressing these four motions for summary judgment. Defendants, in turn, have replied. Voluminous discovery has been filed with this Court.

Dr. Baglio has also filed a motion for partial summary judgment and a motion in limine (Doc. 112), to which the defendants have submitted responses.

For the reasons set forth below, we will grant the motions for summary judgment filed by each of the defendant groups, and grant summary judgment for all defendants to this action on all claims, RICO and antitrust, raised in the complaint. In addition, we will deny plaintiff's motion for partial summary judgment and his motion in limine.

### I. Background

Essentially, the factual background to this dispute is as follows. Aliquippa Hospital is an acute care facility located in Beaver County. Dr. Baglio was the Laboratory Director of the Aliquippa Hospital Pathology Laboratory. Prior to 1987, his employment contract with the hospital provided that it would "remain in full force and effect until terminated by either party giving to the other ninety (90) days notice in writing of the intention to do so." In March of 1987, defendant Howard VanScoy, acting as President and CEO of Aliquippa Hospital, informed Dr. Baglio that his employment would be terminated in ninety days. Plaintiff was further informed that a new contract could be negotiated. Following several weeks of angry letters and meetings, Dr. Baglio signed a new employment contract with the hospital on June 30. The only change from his former contract was in Paragraph 14, which stated:

This agreement supersedes and completely nullifies all provisions of previous agreements. This agreement, shall remain in

full force and effect during the month of July, 1987, and thereafter on a month to month basis until terminated by either party giving to the other thirty (30) days notice in writing of the intention to do so. The complaint alleges that this new thirty day provision was part of a conspiracy to eliminate him as Director of Pathology. Compl. at 16.

The complaint alleges that two related conspiracies to terminate his employment emerged from a complicated series of developments at Aliquippa Hospital and The Medical Center. The mid–1980s, during which Dr. Baglio's employment contract was renegotiated, were undeniably a time of difficulty and reorganization for both of the medical facilities in this action as they each faced growing competition from private, for-profit clinical laboratories. TMC, formed through the merger of a number of smaller hospitals in Beaver County, was a 470–bed facility providing inpatient as well as outpatient services for residents of Ohio, West Virginia, and Pennsylvania. During the 1980s, TMC made several efforts to tap into the for-profit health care market. In 1985, TMC formed the Hospital Physicians Joint Venture ("HPJV") to explore and develop joint venture arrangements. TMC also developed several for-profit corporate entities, including Medical Center Enterprises, Inc., DECA Services, Inc., and DECA Labs, Inc. In one for-profit arrangement, DECA Labs rented office space to individual physicians, who in turn had their employees draw blood. The clinical work on these samples was performed by DECA Labs. One of these phlebotomy facilities, Diagnostic Medical Services, Inc. ("DMS"), was a corporate partnership of four Aliquippa Hospital employees, who are four of the defendants here: Notaro, Shetty, Sia and Thomas.

Aliquippa Hospital, too, underwent a number of structural changes during these years, as the hospital administration and a number of physicians explored joint venture possibilities that would affect various hospital services and departments. In the spring of 1985, defendant Howard W. VanScoy, Jr. became executive director of the hospital. Under his leadership, the hospital underwent

a corporate reorganization. Woodlawn Technologies, Inc. was established as a for-profit holding company, with subsidiaries that included nonprofit corporations Aliquippa Hospital and Woodlawn Health Resources, Inc. Various committees of hospital physicians, administrators and board members met to discuss joint ventures. For example, joint venture schemes were implemented with respect to cardiac catheterization, CT scan services, physical therapy services, and mobile lithotripsy.

One such project involved the pathology lab. Aliquippa's ability to succeed in the increasingly competitive market for medical services was hampered by the age of its laboratory and equipment. The laboratory was not computerized; there were no online connections between the laboratory and various areas of the hospital, or between the laboratory and external physicians' offices. The laboratory's fees for outpatient services were high. In addition, the laboratory did not have a courier service in place to collect specimens from physicians' offices and transport them to the lab. Minutes of meetings of the hospital's board of directors show that a joint venture involving the pathology lab was considered as early as the fall of 1985.

During the summer and fall of 1987, VanScoy and defendant Frank DeLisi met and communicated with representatives of Med–Chek Laboratories, Inc. regarding a laboratory management structure that the hospital wished to develop. They also discussed a conceptual proposal for a joint venture of the laboratory. Med–Chek provided clinical laboratory services and management services to hospitals and physicians. During the same period, Aliquippa Hospital discussed joint-venturing the lab with at least two other concerns, International Clinical Laboratories and Roche Biomedical Laboratories, Inc.

It is clear that the working environment at Aliquippa Hospital was difficult for Dr. Baglio. The record contains numerous complaints and negative comments about his performance. Dr. Baglio himself believed that the changes occurring at Aliquippa Hospital were part of a conspiracy to remove him from his position because he was perceived as an impediment to a laboratory joint ven-

ture. On November 13, 1987, VanScoy and the hospital's attorney, Robert Lewis, met with Dr. Baglio and terminated his employment in accordance with his contract. He lost his staff privileges at Aliquippa Hospital.

After his employment was terminated, Dr. Baglio did not renew his license to practice medicine. He made initial inquiries at the office of the coroner, in Pittsburgh, and at the University of Pittsburgh. However, when these queries were unsuccessful, he did not seek employment elsewhere.

In July of 1988, VanScoy informed Aliquippa Hospital employees that the hospital and Woodlawn Health Resources had signed a Memorandum of Understanding with Med–Chek Laboratories, and that a joint venture was being planned for the development of a pathology laboratory. According to the Draft Prospectus, two labs were proposed: an on-site lab in the hospital would perform a limited number of tests, and a lab off-campus would handle the rest of the hospital's lab work, physician work from both investor and non-investor physicians, and work from outside sources such as nursing homes. Investment was open to all licensed physicians. Med–Chek was to be responsible for the management of both labs.

From December of 1988 to April of 1989, Med–Chek managed the hospital laboratory under a management agreement.

The joint venture was never actualized. Jean M. Andre succeeded VanScoy as President and CEO of Aliquippa Hospital, and did not favor the project. Andre did not believe that the joint venture was in the hospital's best financial interest. By letter dated March 31, 1989, the agreement with Med–Chek was terminated.

In 1987, Dr. Baglio filed an action in the Allegheny County Court of Common Pleas against many of these same defendants. That complaint included allegations against Aliquippa Hospital for unlawful termination of his employment; against many of the Physician Defendants for defamation and "false light," and for conspiracy to interfere with his employment contract; against the hospital and defendants VanScoy and Charles for conspiracy, defamation and false light; and

against Med–Chek for conspiracy. That action is still pending before the Honorable R. Stanton Wettick, Jr. at the Court of Common Pleas.

During the discovery phase of that litigation, plaintiff's counsel filed an interrogatory requesting that defendants Aliquippa Hospital, Woodlawn Technologies, Inc. and Woodlawn Health Resources, Inc. state the reason for the decision to terminate plaintiff's employment contract and the objective to be served by that termination. Dr. Baglio refers to this as the "state court admission." Defendants gave the following response:

> Interrogatory 14(c)—A decision was made to terminate Plaintiff's Agreement with Aliquippa Hospital because the Hospital had made a decision to pursue a joint venture laboratory arrangement. The objective to be served was to increase profitability.

Pl.'s Ex. 1741.

Plaintiff subsequently filed this action.

In his complaint, Dr. Baglio contends that the actions taken by the defendants violated the federal antitrust laws and the RICO statute, and that these allegedly illegal actions either resulted in the termination of his employment with Aliquippa Hospital or that his employment was terminated in order to somehow facilitate these allegedly illegal schemes.

The narrow issues before us are whether plaintiff's antitrust and RICO claims can survive summary judgment. The reasons for the termination of plaintiff's employment are not properly before us; that issue is presently being litigated in state court and does not concern us here.

## II. Summary Judgment Standard

■ Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, and admissions on file fail to demonstrate a genuine issue of material fact so that the moving party is therefore entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In other words, summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party. *Anderson v. Lib-*

*erty Lobby Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The nonmoving party must then go beyond the pleadings and, by affidavits, depositions, answers to interrogatories, and admissions on file, designate facts showing that a genuine issue of material fact remains for trial. *Id.* at 324, 106 S.Ct. at 2553. The nonmoving party must establish the existence of every element necessary to its case, on which it bears the burden of proof. *Miller v. Indiana Hospital*, 843 F.2d 139, 143 (3d Cir.1988). "Facts that could alter the outcome are 'material', and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 302 n. 1 (3d Cir.1995).

In reviewing the record on a motion for summary judgment, the evidence of the nonmovant must be believed, and the court must give the nonmoving party the benefit of all reasonable inferences. *Sempier v. Johnson & Higgins*, 45 F.3d 724, 727 (3d Cir.), *cert. denied*, — U.S. —, 115 S.Ct. 2611, 132 L.Ed.2d 854 (1995).

We have original jurisdiction pursuant to 28 U.S.C. § 1337 over any civil action arising under an Act of Congress protecting trade and commerce against restraints and monopolies. We have original jurisdiction under 18 U.S.C. § 1964 over any civil action or proceeding brought under the Racketeer Influenced and Corrupt Organizations Act.

### III. Discussion

#### A. Antitrust Claims Against Various Defendants

Plaintiff's antitrust claims, alleging violations of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (1994) and § 3 of the Clayton Act, are found in Counts I through IV of the complaint. Count I alleges that all defendants conspired to boycott or attempt to boycott the plaintiff as a provider of pathology services. Count II claims conspiracy in restraint of trade under Section 1 against all defendants. Count III alleges that by conspiring to limit plaintiff's access to the Allegheny Hospital pathology laboratory, the Physician Defendants and the Administrative Defendants violated the Essential Facilities Doctrine under Section 1. And Count IV contains allegations that both the Administrative and Physician Defendants controlled patient admissions and pathology services at Aliquippa Hospital, thus violating the tying provisions of Section 1 and of Section 3 of the Clayton Act.

Section 1 of the Sherman Act provides that:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1.

To establish a Section 1 violation, a plaintiff must prove (1) concerted action by the defendants; (2) that such action produced anticompetitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that plaintiff was injured as a proximate result of the concerted action. *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.*, 998 F.2d 1224, 1229 (3d Cir., *cert. denied sub nom. Moyer Packing Co. v. Petruzzi's IGA Supermarkets, Inc.*, 510 U.S. 994, 114 S.Ct. 554, 126 L.Ed.2d 455 (1993). Although many actions may restrain trade to some extent, whether an action violates Section 1 depends upon whether the restraint is unreasonable. *Miller v. Indiana Hosp.*, 814 F.Supp. 1254, 1259 (W.D.Pa.), *aff'd* 975 F.2d 1550 (3d Cir.1992), *cert. denied*, 507 U.S. 952, 113 S.Ct. 1366, 122 L.Ed.2d 744 (1993), *citing Board of Trade of City of Chicago v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243–44, 62 L.Ed. 683 (1918).

Defendants have each moved for summary judgment on plaintiff's antitrust claims, and we will address their primary arguments in turn. However, before turning to Dr. Baglio's substantive antitrust claims, we must

first determine whether he has standing to raise them.

## Standing

 In their respective motions for summary judgment, the defendants contend that Dr. Baglio lacks standing to assert private antitrust claims. Whether a plaintiff has standing to raise antitrust claims is a threshold issue. *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). The antitrust laws were promulgated to protect competition, not competitors, and courts must analyze the question of antitrust injury from the viewpoint of the consumer of the product or services at issue. *Alberta Gas Chemicals, Ltd. v. E.I. Du Pont de Nemours & Co.*, 826 F.2d 1235, 1241 (3d Cir.1989), *cert. denied*, 486 U.S. 1059, 108 S.Ct. 2830, 100 L.Ed.2d 930 (1988). Courts are extremely cautious about determining that a plaintiff has standing to pursue an antitrust action, because the statute permits the recovery of treble damages. *Gregory Marketing Corp. v. Wakefern Food Corp.*, 787 F.2d 92, 98 (3d Cir.), *cert. denied*, 479 U.S. 821, 107 S.Ct. 87, 93 L.Ed.2d 40 (1986).

 Whether a plaintiff has antitrust standing is determined by a two-pronged test. The plaintiff must first prove that he has suffered an antitrust injury. A plaintiff has suffered an antitrust injury only if (1) he has suffered the type of injury the antitrust laws were intended to prevent, and (2) the injury flows from that which makes defendants' acts unlawful. *Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 429 (3d Cir.1993).

 In addition to establishing that he has suffered an antitrust injury, the plaintiff must prove that he is the most efficient enforcer of the antitrust laws. *Alberta Gas Chemicals, Ltd. v. E.I. Du Pont de Nemours & Co.*, 826 F.2d 1235, 1249 (3d Cir.1987), *cert. denied*, 486 U.S. 1059, 108 S.Ct. 2830, 100 L.Ed.2d 930 (1988); *accord, In re Lower Lake Erie Iron Ore Antitrust Litigation*, 998 F.2d 1144, 1163 (3d Cir.), *cert. dismissed*, 510 U.S. 1021, 114 S.Ct. 625, 126 L.Ed.2d 589 (1993). This is a question of causation. "An-

titrust standing goes beyond the Constitutional standing requirement of 'injury in fact' and is not satisfied by the mere allegation of a causal connection between an alleged antitrust violation and harm to the plaintiff." *Mathews v. Lancaster General Hospital*, 883 F.Supp. 1016, 1045 (E.D.Pa.1995), *aff'd*, 87 F.3d 624 (3d Cir.1996). "An antitrust plaintiff must prove that challenged conduct affected the prices, quantity or quality of goods or services, not just his own welfare." *Mathews*, 87 F.3d at 624, quoting *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 728 (3d Cir.1991), *cert. denied*, 505 U.S. 1221, 112 S.Ct. 3034, 120 L.Ed.2d 903 (1992). A private plaintiff can recover on an antitrust claim only where the loss "stems from a competition-reducing aspect or effect of the defendant's behavior." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344, 110 S.Ct. 1884, 1894–95, 109 L.Ed.2d 333 (1990).

 Dr. Baglio's complaint alleges that he was injured by the termination of his staff privileges at Aliquippa Hospital, by the termination of his position as the director of the hospital's pathology laboratory, and by damage to his reputation. Compl. at ¶¶ 115–118. Defendants contend that none of these alleged harms constitute an antitrust injury, and we agree.

 Whether a physician's claim that a hospital has violated the antitrust laws by denying staff privileges is properly resolved on a motion for summary judgment. *Brader v. Allegheny General Hosp.*, 64 F.3d 869, 876 (3d Cir.1995). Numerous decisions, in this circuit and others, have established the proposition that the loss of a physician's staff privileges, without more, is not an antitrust injury because the loss does not harm the consumer of medical services, but simply constitutes a personal harm to the individual physician.

For example, in *Mathews v. Lancaster General Hospital*, the Court of Appeals for the Third Circuit recently addressed the question of whether a hospital's decision to restrict an orthopedic surgeon's staff privileges gave him antitrust standing, and held that it did not. 87 F.3d 624 (3d Cir.1996). The factual background in *Mathews* strongly

resembles the facts of the case before us. Briefly, Mathews was an orthopedic surgeon. The hospital where he enjoyed staff privileges developed a joint venture with another medical center to provide orthopedic services. Mathews alleged that both the hospital and a number of individual physicians acted in concert to arrange a sham peer review proceeding and to pressure the hospital board to restrict his staff privileges. Mathews claimed that restricting his staff privileges was an antitrust injury because it reduced competition for orthopedic services in the relevant marketplace, which was Lancaster County, Pennsylvania.

The district court granted summary judgment for the defendants on several grounds, including plaintiff's failure to establish that he had suffered an antitrust injury. The Third Circuit affirmed, stating that the restriction on privileges was not an antitrust injury "because orthopedic services are still readily available to consumers in the Lancaster area." *Id.* In other words, the injury was personal to Dr. Mathews and affected neither the quantity nor quality of services available to consumers. In addition, the court found that Dr. Mathews ability to practice medicine was not extinguished; the hospital's decision simply curtailed his ability to perform spinal surgery at a particular hospital. *Id.*

Similarly, in *Huhta v. Children's Hosp. of Philadelphia,* 1994 WL 245454 (E.D.Pa. 1994), *order aff'd,* 52 F.3d 315 (3d Cir.1995), a physician alleged that restrictions on his staff privileges would harm consumers of cardiac services because they would be forced to pay higher prices than he would have charged. *Id.* The district court held that the physician's loss of patient referrals and loss of income did not establish an antitrust injury. "The harm alleged in the complaint is really only harm to the individual doctor, and not to competition within the marketplace." *Id.* at *2. *See also Lie v. St. Joseph Hosp. of Mount Clemens, Mich.,* 964 F.2d 567 (6th Cir.1992) (affirming summary judgment where physician failed to show an injury to competition in the form of increased cost or reduced supply of services); *Tarabishi v. McAlester Regional Hosp.,* 951 F.2d 1558 (10th Cir.1991) (physician failed to establish required impact on competition), *cert. denied,* 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992).

In the case before us, defendants have shown that Dr. Baglio's termination did not cause an injury to the consumers of pathology services. The pathology lab continued to operate under the direction of several other pathologists and the management of Med-Chek. There was no decrease in available services. Baglio Dep. at 213. In fact, the Aliquippa Hospital lab's volume increased under his immediate predecessor, Dr. DiMarzio. Baglio Dep. at 512–13. Indeed, Dr. Baglio testified at his own deposition that:

the services continue more or less unchanged. There was no interruption just because I left the hospital, the services were not interrupted, they continue, there was no interruption.

Baglio Dep. at 213.

Dr. Baglio's three-volume response to defendants' motions for summary judgment does not address this threshold issue of antitrust standing. Plaintiff argues at length that under *Summit Health, Ltd. v. Pinhas,* 500 U.S. 322, 111 S.Ct. 1842, 114 L.Ed.2d 366 (1991), the alleged acts of the defendants had a sufficient impact on interstate commerce to satisfy the jurisdictional requirements of the Sherman Act. Pl.'s Mem. of Law at ¶¶ 26–29. We do not decide whether this component of a Section 1 claim may indeed be met by the evidence produced in this case. In order to have standing to raise his Section 1 claims, Dr. Baglio must first offer proof that he has suffered an antitrust injury, and this he has failed to do.

Dr. Baglio has failed to cite a single case dealing with antitrust injury. His Memorandum of Law relies heavily on *Patrick v. Burget,* 486 U.S. 94, 108 S.Ct. 1658, 100 L.Ed.2d 83 (1988), to support his antitrust claims. In that case, the plaintiff was a physician practicing in a single-hospital community. He alleged that other local physicians conspired to revoke his hospital privileges through a peer review process because he would not join their clinical practice, and that this violated the antitrust laws. *Patrick,* however, is completely inapposite here be-

cause the issue on appeal in that case was whether the state action doctrine protects physicians from antitrust liability when they conduct a state-mandated peer review process. The United States Supreme Court held that it does not. The state action doctrine has absolutely no relevance to the case at bar, and plaintiff's reliance on it is misplaced.

Dr. Baglio failed to indicate any evidence from which we may conclude that a genuine issue of material fact remains for trial on this issue. He offers no proof that the decision to terminate his employment at the pathology laboratory in any way restricted pathology services in the marketplace. He offers no proof that any of the activities of any of the defendants restricted the competition for pathology services within the area served by Aliquippa Hospital or by the Medical Center. Indeed, both his response and his Memorandum of Law are remarkably silent on this crucial threshold issue. He merely contends that "contrary to what the Defendants contend in respect of the Count I and Count II Sherman claims, Plaintiff has presented evidence of injury to himself, and injury to participants in the marketplace who paid for kickbacks, in addition to paying for services." Pl.'s Mem. at ¶ 40.

This conclusory allegation only reinforces our finding that the injury suffered was personal. Considering the record as a whole, we find no evidence from which to conclude that Dr. Baglio has suffered an antitrust injury. He has thus failed to meet the first prong of the antitrust standing analysis.

■ Even if he had been so injured, Dr. Baglio would not have standing to raise his antitrust claims without also establishing that he is the most appropriate plaintiff. A showing of antitrust injury is necessary but not sufficient to establish antitrust standing, and a plaintiff may indeed have suffered an antitrust injury yet not be considered the proper plaintiff to bring an antitrust action. *Alberta Gas,* 826 F.2d at 1240. *See Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986).

■ To determine whether a plaintiff is a proper antitrust plaintiff, courts have focused on whether there are more direct victims of the alleged antitrust violations, and whether the plaintiff can effectively represent the interests of such victims. *Huhta,* 1994 W.L. 245454 at *2. Put another way, where there exists "an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement," such persons, not one who has suffered a more indirect harm from the defendant's conduct, are the proper plaintiffs to bring an antitrust action. *Associated General Contractors,* 459 U.S. at 542, 103 S.Ct. at 910–11.

■ The defendants argue that even if Dr. Baglio had suffered an antitrust injury, he lacks standing to bring this action because he is not the most efficient plaintiff. We agree. Dr. Baglio alleges that the defendants caused harm not only to himself, but to "participants in the marketplace who paid for kickbacks, in addition to paying for services." Pl.'s Mem. at ¶ 40. We read this allegation to mean that patients needing pathology services would bear increased costs because of the actions of the defendants.

Dr. Baglio is not the appropriate plaintiff to represent the interests of those who might use the pathology lab. It is these patients and the larger payor community who would be directly injured by the alleged antitrust violations, and therefore they must bring an action on their own behalf. *Huhta,* 1994 WL 245454 at *2; *Todorov v. DCH Healthcare Authority,* 921 F.2d 1438, 1455 (11th Cir. 1991).

Dr. Baglio has failed to meet either prong of the test for antitrust standing. He has failed to prove an antitrust injury, because he has only alleged personal harm. And even if the alleged injury violated Section 1, Dr. Baglio has not established that he is the most appropriate plaintiff to redress the harm. Accordingly, we find that the plaintiff lacks standing to raise any of the antitrust claims made against any of the defendants in this action. Since we will grant summary judgment on all antitrust claims contained in Counts I, II, III, and IV of the complaint, as to all defendants, we need not reach Dr. Baglio's substantive antitrust allegations.

## B. RICO Claims

RICO provides a private right of action under 18 U.S.C. § 1964(c) for violations of the statute. Under RICO,

[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

18 U.S.C. § 1964(c).

In other words, in order for a plaintiff to recover damages under the RICO statute, the complaint must aver a violation of Section 1962(a), (b), (c), or (d), as well as an injury to business or property by reason of this violation. This latter "by reason of" pleading requirement is one of causation, and is commonly referred to as RICO standing. *Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162, 1164 (3d Cir.1989).

Dr. Baglio's complaint includes two RICO claims. Count V alleges that all defendants except Baska and Heinle conducted the affairs of an enterprise through a pattern of racketeering activity in violation of Section 1962(c). Count VI alleges that all the defendants conspired to violate Section 1962(c), in violation of Section 1962(d), Conspiracy to Conduct Racketeering Activities.

We understand the structure of plaintiff's RICO claims to be as follows:[1] Plaintiff alleges that the Physician Defendants, the Administrative Defendants, and Med–Chek formed an association in fact which he calls the "Aliquippa Enterprise." Compl. at ¶ 121. The Aliquippa Enterprise acted through Aliquippa Hospital, itself an enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), to conduct a series of joint ventures designed for the financial benefit of each of the defendants. Compl. at ¶ 121(A). One such joint venture involved the hospital pathology laboratory. It is alleged that the acts taken in furtherance of these joint ventures were both predicate acts under Section 1962(c) and acts taken in furtherance of a conspiracy under Section 1962(d). Compl. at ¶ 121. Plaintiff claims that these acts formed a pattern of racketeering under Section 1962(c). Pl.'s Mem. of Law at ¶ 10.

A second enterprise was allegedly formed by defendants Thomas and Hersch. The Complaint denominates this as an association in fact called the "Beaver Enterprise," and contends that it operated through DECA Labs, itself an enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), to obtain control of medical services in Beaver County. Compl. at ¶¶ 121, 122. The alleged purpose of the Beaver Enterprise was "to take over the acute care health delivery system in Beaver County, and surrounding counties, and to control the delivery of ancillary health care services." Pl.'s Mem. of Law at ¶ 6(a). One of the health services it allegedly sought to control was the Aliquippa Hospital pathology laboratory. Pl.'s Mem. of Law at ¶ 6(a).

Dr. Baglio asserts that some of the activities of both the so-called Aliquippa Enterprise and the so-called Beaver Enterprise constituted Medicare and Medicaid fraud under the anti-kickback provisions of 42 U.S.C. § 1320a–7(b) and 62 P.S. § 1407, violating those statutes as well as the Travel Act, 18 U.S.C. § 1952. Pl.'s Mem. of Law at ¶ 7; Rico Case Stmt. at ¶ 5.

We note that the Commonwealth of Pennsylvania brought charges of Medicaid fraud against MCE, charging that MCE, operating through DECA Labs, made payments to physicians in exchange for blood sample work performed on Medicaid patients. Pl.'s Ex. 373. The Commonwealth charged that some physicians referred blood samples to the lab without operating blood-collection stations, and that this constituted paying kickbacks for patient referrals in violation of the antikickback provisions of the Medicaid statute. On October 26, 1990, MCE pled no contest to one charge of Medicaid fraud, and paid a $5,000 fine plus costs.

Plaintiff further contends that the activities of the Beaver Enterprise acting through DECA Labs and the Aliquippa Enterprise

---

1. In construing plaintiff's RICO allegations, we have relied upon the Complaint, plaintiff's RICO Case Statement, plaintiff's Memorandum of Law, and plaintiff's three-volume Response to Defendants' Motions for Summary Judgment.

acting through Aliquippa Hospital, as well as what he terms the "racketeering-gangster war between Aliquippa Hospital and the Aliquippa Enterprise, on the one hand, and the DECA and the Beaver Enterprise, on the other hand," caused injury in violation of Section 1962(c). Compl. at ¶ 122. Plaintiff claims that he was personally injured by his termination as director of the pathology lab at Aliquippa Hospital and by the defacto termination of his staff privileges at that facility. Compl. at ¶ 122.

In addition, Dr. Baglio alleges that the activities of each of the defendants to this action were part of a conspiracy, in violation of Section 1962(d). He claims that the Physician Defendants, the Administrative Defendants, and Med–Chek entered a conspiracy to divert fees for pathology services at Aliquippa Hospital, including Medicare and Medicaid reimbursement monies, to a joint venture for personal gain. Compl. at ¶ 186. Plaintiff further contends that the TMC Defendants entered into a conspiracy, the object of which was "the attempted monopolization of pathology services in Beaver County." Compl. at ¶ 187. He claims that this scheme was carried out (1) by diverting fees for pathology services, including reimbursement for Medicare and Medicaid, to the DECA Labs joint venture and (2) by destroying competent pathology laboratory services at Aliquippa Hospital. Compl. at ¶ 187.

We turn first to the defendants' arguments for summary judgment on plaintiff's Section 1962(c) claim.

### 1. Section 1962(c)

Section 1962(c) prohibits:

any person employed by or associated with any enterprise engaged in, or in the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).

■ A claim alleging a pattern of racketeering under Section 1962(c) requires proof of four elements: (1) the existence of an enterprise affecting interstate commerce; (2) that the defendant was employed by or associated with the enterprise; (3) that the defendant participated, directly or indirectly, in the conduct or the affairs of the enterprise; and (4) that the defendant participated through a pattern of racketeering activity that must include the allegation of at least two racketeering acts. *Shearin*, 885 F.2d at 1165.

■ Liability under Section 1962(c) is limited to those who participate in the operation or management of the enterprise itself. *Reves v. Ernst & Young*, 507 U.S. 170, 194–96, 113 S.Ct. 1163, 1178, 122 L.Ed.2d 525 (1993). This includes upper management as well as lower-level employees acting under their direction. *Id.* An enterprise also may be operated or managed by outsiders, where they exert control over the enterprise, through, for example, bribery. *Id.* However, a business may not be held liable under a theory of respondeat superior. *Leonard v. Shearson Lehman/American Exp. Inc*, 687 F.Supp. 177, 182 (E.D.Pa.1988), citing *Petro–Tech, Inc. v. Western Co. of North America*, 824 F.2d 1349, 1359 (3d Cir.1987).

■ In addition, the Court of Appeals for the Third Circuit requires that under Section 1962(c) the "person" be distinct from the "enterprise." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir.1993). Section 1962(c) liability attaches only to the "person." "[T]he RICO "person" is the active wrongdoer, while the RICO "enterprise" is the passive instrumentality through which the "person" performs the predicate acts." *Leonard v. Shearson Lehman/American Exp. Inc*, 687 F.Supp. 177, 181–82 (E.D.Pa. 1988), citing *Petro–Tech, Inc. v. Western Co. of North America*, 824 F.2d 1349, 1359 (3d Cir.1987). A corporate defendant may be a "person" and thus liable under Section 1962(c), but only if it, through a pattern of racketeering, conducted the affairs of an enterprise other than itself. *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.*, 46 F.3d 258, 268 (3d Cir.1995), citing *Petro–Tech*, 824 F.2d at 1358.

■ Merely committing the predicate offense does not violate Section 1962(c). *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479,

496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). The plaintiff must also show causation between the activity and the injury. It is well settled that the plaintiff cannot prevail upon a Section 1962(c) claim unless he has been injured in his business or property by the conduct constituting the violation. *Sedima*, 473 U.S. at 496, 105 S.Ct. at 3285. Even if the underlying predicate acts formed a pattern of racketeering activity, they must also have directly caused the plaintiff's injury. "[T]he requirement of injury in one's 'business or property' limits the availability of RICO's civil remedies to those who have suffered injury-in-fact." *Holmes v. SIPC*, 503 U.S. 258, 279, 112 S.Ct. 1311, 1323, 117 L.Ed.2d 532 (1992). There must be a direct relationship between the injury asserted and the injurious conduct alleged. *Id.* Only where proximate cause exists does a plaintiff have standing to raise a RICO claim. *Id.*

In their respective motions for summary judgment, each of the defendants to this action argues that Dr. Baglio lacks standing to assert his Section 1962(c) claims because the alleged predicate acts did not cause the alleged harm. Thus, as a threshold issue, we must determine whether the alleged predicate acts injured the plaintiff in his business or property. If the element of causation is lacking, then Dr. Baglio lacks standing under the statute and we need not address the substance of his RICO claims.

We note that none of the plaintiff's submissions directly address his standing to raise a claim under Section 1962(c). The plaintiff asserts that an injury under Section 1962(c) need not be a "racketeering injury," and we agree. Mem. of Law at ¶¶ 22, 23. Section 1962 does not contain a distinct racketeering injury requirement. *Sedima*, 473 U.S. at 495, 105 S.Ct. at 3284. However, the alleged harm must be caused by the underlying predicate acts. The only causation argument advanced in plaintiff's Memorandum of Law is the following conclusory statement:

23. There is evidence that a jury may find as a fact, that Plaintiff's termination was the direct and proximate cause of the ALIQUIPPA HOSPITAL physicians' violation of the Hobbs Act at 18 U.S.C. § 1951 in making threats against the property of ALIQUIPPA HOSPITAL, to-wit, ALIQUIPPA HOSPITAL'S Medicare and Medicaid revenue from clinical pathology laboratory services, as well as other acts of racketeering activity in furtherance of the racketeering scheme.

Pl.'s Mem. at Law at § 23.

We suspect that plaintiff means that the alleged activities of the Physician Defendants caused plaintiff's termination, and not the other way around.

Dr. Baglio asserts that the alleged injury to business or property is "being terminated from his profession of medicine in his area of specialty, being clinical pathology." RICO Case Stmt. at ¶ 15. The question we must pose, then, is whether any of the alleged predicate acts caused Dr. Baglio to lose his position as director of the pathology lab. We have discerned a number of predicate acts from the materials submitted by the plaintiff, and find that, even if these acts occurred as the plaintiff claims, none of them proximately caused the harm complained of.

### Joint Ventures and Alleged Medicare and Medicaid Violations

Dr. Baglio alleges numerous ways in which the defendants, through joint venture arrangements, violated the anti-kickback portions of the Medicare and Medicaid statutes and therefore the Travel Act. He alleges that the Medical Center Defendants referred lab work to DECA Labs in exchange for "kickbacks." Rico Case Stmt. at ¶ 2. He claims that these kickbacks were disguised as rental payments, but were in fact fraudulent violations of the Medicare and Medicaid statutes, 42 U.S.C. § 1320a–7(b) and 62 Pa.S.A. § 1407. Rico Case Stmt. at ¶ 5 The predicate acts alleged in connection with this scheme involved mailing Medicare/Medicaid reimbursement checks to DECA Labs, and mailing kickback checks, disguised as rent checks, to the Baska, Heinle and Thomas corporations, in violation of 18 U.S.C. § 1341. Rico Stmt. at ¶ 5. The plaintiff emphasizes that the defendants pled no contest to one charge of Medicaid fraud, and paid a fine.

With respect to the remaining defendants, plaintiff contends that the actions of various defendant physicians, officers, and directors

834

in promoting and establishing the Aliquippa Hospital clinical pathology laboratory joint venture, were similarly based upon a scheme of Medicare and Medicaid kickbacks. Pl.'s Mem. of Law at ¶ 19.

The only Court of Appeals to address alleged Medicare and Medicaid kickbacks in the context of health care joint ventures is the Ninth Circuit. *Hanlester Network v. Shalala,* 51 F.3d 1390 (9th Cir.1995). *Hanlester* does not appear to support plaintiff's position:

The fact that a large number of referrals resulted in the potential for a high return on investment, or that the practical effect of low referral rates was failure for the labs, is insufficient to prove that appellants offered or paid remuneration to induce referrals.

*Hanlester,* 51 F.3d at 1399.

In other words, physician self-referral joint ventures are not prohibited *per se* by the plain language of the statute. However, we need not reach the issue of whether the conduct of the defendants in the action before us constituted such fraud. Even if the actions of any of the defendants violated the anti-kickback provisions of the Medicare and Medicaid statutes, such violations did not directly cause Dr. Baglio to lose his position as director of the pathology lab because he was not the target of any such fraud.

Medicare and Medicaid fraud is perpetrated upon the United States government. To strengthen the government's ability to prosecute fraud and abuse in the Medicare–Medicaid system, Congress amended the antikickback statute in 1977. Medicare–Medicaid Antifraud and Abuse Amendments, Pub.L. No. 95–142, 91 Stat. 1174, 1182 (1977). In 1987, Congress consolidated the antikickback provisions of state and federal health care programs into § 1128(b) of the Social Security Act, 42 U.S.C. § 1320a–7(b). These amendments allow the imposition of penalties and assessments for fraudulent submission of Medicare and Medicaid claims. The purpose of such penalties is to make the government whole for moneys expended in paying fraudulent claims and in investigating fraudulent submissions. *Bernstein v. Sullivan,* 914 F.2d 1395 (9th Cir.1990).

*Hanlester* is again instructive. We note that *Hanlester* was brought by the Secretary for Health and Human Services, who has the authority under the Act to impose civil penalties for violations. The Court of Appeals for the Ninth Circuit stated that:

The remedial purpose of § 1128(b) is to enable the Secretary to protect federally-funded health care programs and their beneficiaries and recipients from future conduct which is or might be harmful.

*Hanlester,* 51 F.3d at 1401–02, citing Social Security Act, § 1128

■ In other words, violations cause harm to the federally-funded programs and to those who use such programs. Dr. Baglio, as a physician and laboratory director, could not have been harmed even if such fraud had occurred. Therefore, insofar as plaintiff alleges that violations of the anti-kickback provisions form part of the pattern of racketeering and constitute predicate acts within the meaning of Section 1962(c), his contention that such violations were the proximate cause of his own loss of employment must fail. Any relation between such violations and the alleged harm is far too attenuated to confer standing to bring a RICO claim. The predicate acts alleged did not proximately cause Dr. Baglio's termination.

**Failure to Cooperate with
Joint Venture Plans**

Dr. Baglio further contends that his employment was terminated because he failed to fully cooperate with the allegedly illegal activities of the defendants. Although he frames the allegations against various defendants in different ways, he basically claims that he was terminated so that the laboratory could be joint ventured to the benefit of each of these defendants.

The clearest statement of this claim is presented in Volume I of Plaintiff's Response to Defendants' Motions for Summary Judgment ("Vol. I"):

The firing was brought about to accommodate the progress of the laboratory schemes, and caused the Plaintiff to loose [sic] his job.... The manner of the firing

was calculated to discredit Plaintiff, so that he would not be perceived as raising legitimate questions about the intended Aliquippa laboratory Scheme, and that caused Plaintiff to loose [sic] an opportunity to earn a living through the exercise of his staff privileges at Aliquippa Hospital and elsewhere.

Vol. I at ¶ 40.

We have previously stated that the reasons for plaintiff's termination are not properly before us, and are presently being litigated in state court. It is undeniable that certain defendants were involved in the plaintiff's termination. After all, the defendants here include members of the board of directors at the hospital where he was employed, as well as a number of physicians and administrators with whom he interacted professionally. At issue here, however, is whether Dr. Baglio's termination, if it occurred for the reasons alleged, confers standing to raise RICO violations. We find that it does not.

▇▇▇▇ The allegations here fail to establish proximate cause and thus do not confer RICO standing. A plaintiff does not have standing to sue for a violation of Section 1962(c) where the injury consists of termination from employment for failure to cooperate with the employer's racketeering activity. *Casper v. Paine Webber Group, Inc.*, 787 F.Supp. 1480, 1495 (D.N.J.1992). Where the underlying racketeering activity is not directed at the plaintiff, but merely results in a loss of employment, a plaintiff lacks standing to raise claims under Section 1962(c).

The Court of Appeals for the Third Circuit so held in *Shearin v. E.F. Hutton Group, Inc.*, 885 F.2d 1162 (3d Cir.1989). In that case, plaintiff Kay Shearin claimed that she had been fired from her position at Hutton Trust for refusing to go along with a scheme involving securities fraud. The court held that Shearin lacked standing to bring her Section 1962(c) claim, because the predicate acts, including investment of unlawfully collected fees, and securities and wire fraud, did not cause her to lose her job. *Id.* at 1168. If the predicate acts caused an injury, it was to Hutton's customers who were the targets of the fraud. *Id.* at 1168.

*Shearin* was cited with approval in *Flinders v. Datasec Corp.*, 742 F.Supp. 929 (E.D.Va.1990), in which the plaintiff sued his former employer under Section 1962(c) claiming that his employment had been terminated because he had refused to participate in a sales kickback scheme. Allegedly, telephone calls had been used to set up the scheme, and kickback checks had been sent through the mails. The court analyzed the relationship between the firing and the alleged predicate acts, and dismissed plaintiff's Section 1962(c) claim for lack of causation. The *Flinders'* court reasoned that:

> Manifestly, plaintiff was not the target of these acts. They were not aimed at him; rather, they were aimed at Datasec's competitors. Thus, the firing was not proximately caused by the predicate acts; instead, it was an incidental result of circumstances surrounding those acts.... the loss of plaintiff's job ... occurred not as a result of the predicate acts, but of his refusal to participate in them. So viewed, it is apparent that plaintiff's termination injury did not occur "by reason of" the alleged RICO scheme.

*Flinders v. Datasec Corp.*, 742 F.Supp. 929, 932 (E.D.Va.1990).

We find that the reasoning in *Shearin* and *Flinders* is apposite here. Even if the plaintiff was terminated for refusing to cooperate with the joint ventures, or so that the joint ventures could proceed, his termination was not proximately caused by the predicate acts but was merely an incidental result of the circumstances surrounding those acts.

Plaintiff alleges that the defendants' conduct caused him to lose not only the position as director of the pathology lab, but also the "opportunity to earn a living ... elsewhere." Vol. I at ¶ 40. We find no evidence that this is so. No actions taken by any of the defendants here caused Dr. Baglio to completely cease practicing his profession following his termination as director of the pathology laboratory. Plaintiff made that decision himself. In 1987 he voluntarily allowed his license to expire. ADMN App. 50. He testified in his own deposition that he had become totally disgusted with medicine. ADMN App. 48. Dr. Baglio admitted that following the termi-

nation of his employment contract he made no serious effort whatsoever to seek other employment, either in the Beaver County area or elsewhere. He testified that after his termination he "called the coroner's office here in Pittsburgh," and "made some contact with the University of Pittsburgh." ADMN App. 49, 51. He admitted that his attempts to go back to work were "superficial," and stated that "I never applied to any hospital." ADMN App. 49, 51.

■■■ Dr. Baglio has failed to offer proof that he was the intended target of these alleged fraudulent acts, and therefore he has failed to establish the threshold requirement of standing to bring claims under Section 1962(c). Accordingly, we will grant summary judgment on plaintiff's RICO claims for all defendants named in Count V of the Complaint.

### 2. Section 1962(d)

Dr. Baglio has also alleged claims of conspiracy under the RICO statute. Under Section 1962(d), "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section." 18 U.S.C. § 1962(d).

■■■ "Any claim under section 1962(d) based on a conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir.1993), citing *Leonard v. Shearson Lehman/American Express, Inc.*, 687 F.Supp. 177, 182 (E.D.Pa. 1988).

■■■ Count VI of the complaint alleges that all the defendants conspired to violate Section 1962(c). However, plaintiff has not established a viable claim under any of those subsections. Accordingly, his Section 1962(d) claim must also fail and we will grant summary judgment for all defendants on Count VI of the Complaint.

In their motions for summary judgment defendants have raised a number of additional arguments. These include whether the plaintiff correctly separated certain individual defendants from the alleged enterprise, whether the alleged predicate acts formed a pattern of racketeering activity, and whether each of the defendants participated in the operation or management of the enterprise. We need not reach these arguments. Having found that Dr. Baglio lacked standing to bring an action under Section 1962(c) and that the failure of this claim negates any cause of action under Section 1962(d), we will grant summary judgment on Counts V and VI in their entirety.

### C. Plaintiff's Motion for Partial Summary Judgment

Finally, we turn to plaintiff's motion for partial summary judgment, and motion in limine to limit the scope of the testimony presented at trial. As we have granted summary judgment on all of the claims raised in the complaint as to each of the defendants in this action, we will deny plaintiff's motions.

### V. Conclusion

As we have determined that Dr. Baglio lacks standing to bring claims under the RICO statute or under the federal antitrust laws, we will grant summary judgment for all defendants on all counts of Dr. Baglio's complaint. Furthermore, we will deny plaintiff's motion for partial summary judgment.