Ceiriog **HUGHES**, Plaintiff,

v.

**HALBACH & BRAUN INDUSTRIES, LTD., a Pennsylvania corporation, Halbach & Braun Maschinenfabrik Gmbh & Co., a Federal Republic of Germany corporation, Mine Technik America, Inc., a Delaware corporation, Millcraft Industries, a Pennsylvania corporation, Westfalia Becorit Industrietecnik Gmbh, a Federal Republic of Germany corporation, Westfalia Mining Progress, Inc., a Delaware corporation, Ruhrkohle Bergbau AG, a Federal Republic of Germany corporation, Rag Beteiligungs–Gmbh, a Federal Republic of Germany corporation, Deutsche Bergbau Technik Gmbh, a Federal Republic of Germany corporation, et al., Defendants.**

No. Civ.A. 97–1348.

United States District Court,
W.D. Pennsylvania.

Jan. 13, 1998.

Ronald C. Weingrad, Pittsburgh, PA, for plaintiff.

Babst Calland Clements & Zomnir, J Frank McKenna III, Pittsburgh, PA, for defendants Mine Technik, Jack Piatt, M. Davin, H. Papenbrock, R. Sylvester, J. Geisler.

Cohen & Grigsby, Patrick Barry, Pittsburgh, PA, for defendant Millcraft Indust.

Manion McDonough & Lucas, Joseph McDonough, Pittsburgh, PA, for defendant Robert Fisher.

## OPINION AND ORDER OF COURT

AMBROSE, District Judge.

Plaintiff Ceiriog Hughes ("Hughes"), former Vice President, Sales and Service, of Defendant Halbach & Braun Industries Ltd. ("H & B"), commenced this suit following the termination of his employment. The Complaint and Amended Complaint[1] set forth thirteen alleged causes of action, ranging from breach of contract to antitrust violations, stemming from Hughes's refusal to participate in an alleged bid-rigging scheme.

Hughes has named a wealth of defendants, including: H & B, his former employer, and an American subsidiary of Defendant Halbach & Braun Maschinenfabrik GmbH & Co. ("HBM"); Eberhard Braun, President and owner of HBM; Edgar Maier Reinhardt, President of H & B; Mine Technik America, Inc. ("Mine Technik"), with whom H & B merged on November 13, 1995; Millcraft Industries ("Millcraft"), an H & B minority shareholder; Jack Piatt, President of Millcraft; Robert Fisher, Executive Vice President of H & B; Hans Papenbrock, Vice President of Engineering of H & B; Westfalia Becorit Industrietecnik GmbH; Westfalia Mining Progress, Inc., which changed its name on July 25, 1995, to Mine Technik; Walter von der Linden, President of Westfalia; Robert Sylvester, Comptroller of Westfalia Mining; Micahel Davin, Comptroller of Hemscheidt USA; Deutsche Bergbau–Technik GmbH; Ruhrkohle Bergbau AG; Joachim Geisler, Chief Executive of Mine Technik; RAG Beteiligungs–GmbH; and Dr. Hans Jacobi, Chairman of the managing board of RAG Technik AG. The individuals are named both in their individual and official capacities.

Pending is a "Motion to Dismiss Counts One, Five, Seven, Eight, Nine, Ten, Eleven and Twelve Pursuant to Fed.R.Civ.P. 12(b)(6); and, in the alternative, as to Counts Five and Nine, Motion for More Definite Statement Pursuant to Fed.R.Civ.P. 12(e)," (Docket No. 7), filed on behalf of Mine Technik, Platt, Davin, Papenbrock, Sylvester and Geisler (hereinafter collectively referred to as the "Defendants"). The Defendants essentially challenge the assertion of Counts 1, 5, 7, 8, 9, 10, 11, 12 on the basis of either standing or timeliness.[2] Hughes takes issue with each of the Defendants' statements.

---

1. The Amended Complaint simply adds an additional count, and does not purport to contain all of the averments set forth in the original Complaint. Accordingly, I will treat it as a supplement to, rather than replacement of, the Complaint.

2. Defendants do not, however, seek the dismissal of claims asserted in Counts 2, 3, 4, 6 or 13.

After careful consideration, and for the reasons set forth below, the Motion is denied as to Counts 11 and 12, and granted in all other respects. The dismissal of Counts 5, and 7 is, however, without prejudice to file an Amended Complaint curing the deficiencies.

### STANDARD

In deciding a motion to dismiss, all factual allegations and all reasonable inferences therefrom must be accepted as true and viewed in the light most favorable to the Plaintiff. *Colburn v. Upper Darby Twp.*, 838 F.2d 663, 666 (3d Cir.1988.), *cert. denied*, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989). I may dismiss a complaint only if it appears beyond a reasonable doubt that plaintiff can prove no set of facts in support of his claims which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). In ruling on a motion for failure to state a claim, I must look to "whether sufficient facts are pleaded to determine that the complaint is not frivolous, and to provide defendants with adequate notice to frame an answer." *Colburn*, 838 F.2d at 666.

### ANALYSIS

(A) *Count One—Sherman Antitrust Act*

■ In Count One, Hughes contends that the Defendants "conspired and agreed to rig the bids for the Cypress Emerald contract so that Westfalia Mining, the American subsidiary of Westfalia, would be awarded the contract on price, even though said price was artificially inflated." Complaint, ¶ 65. Hughes argues that this conspiracy and bid-rigging violated § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and that he suffered a resulting injury in the nature of termination of employment and damage to his reputation.

■ Defendants counter that Hughes has no standing to sue for wrongful termination.

"Whether a plaintiff has standing to raise antitrust claims is a threshold issue." *Baglio v. Baska et. al.*, 940 F.Supp. 819, 828 (W.D.Pa.1996), *aff'd*, 116 F.3d 467 (3d Cir. 1997), *citing, Associated General Contractors, of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). "The antitrust laws were promulgated to protect competition, not competitors, and courts must analyze the question of antitrust injury from the viewpoint of the consumer of the product or services at issue." *Id., citing, Alberta Gas Chemicals, Ltd. v. E.I. DuPont De Nemours*, 826 F.2d 1235, 1241 (3d Cir.1987), *cert. denied*, 486 U.S. 1059, 108 S.Ct. 2830, 100 L.Ed.2d 930 (1988). Consequently, courts are hesitant to find standing to exist, because the antitrust statute permits the recovery of treble damages. *Gregory Marketing Corp. v. Wakefern Food Corp.*, 787 F.2d 92, 98 (3d Cir.1986), *cert. denied*, 479 U.S. 821, 107 S.Ct. 87, 93 L.Ed.2d 40 (1986).

■ Courts employ a two-pronged test to determine whether a plaintiff has standing. "The plaintiff must first prove that he has suffered an antitrust injury." *Baglio*, 940 F.Supp. at 828. The second inquiry requires that the plaintiff "prove that he is the most efficient enforcer of the antitrust laws." *Id.* (citations omitted). Defendants do not challenge Hughes' standing as to the second element.[3]

■ Instead, the Defendants only attack Hughes' ability to demonstrate an "injury." According to the United States Court of Appeals for the Third Circuit, a plaintiff has suffered an antitrust injury only if (1) he has suffered the type of injury which the antitrust laws were designed to protect; and (2) the injury flows from that which makes defendant's acts unlawful. *Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 429 (3d Cir.1993).

---

**3.** I acknowledge that Defendants state, in a conclusory footnote, and without any substantive analysis whatsoever, that Hughes is not the most efficient enforcer of the laws. *See* Docket No. 8, p. 5–6, n. 5 & 6. Resolution of this issue requires consideration of a variety of factors enumerated by the Supreme Court. *See Associated General*

*Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 537–45, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). I will not conduct an independent analysis of whether Hughes satisfies this test, when Defendants have treated this issue in a summary fashion.

Termination from employment is not, Defendants insist, the type of injury that the antitrust laws were written to guard against. The Third Circuit court's decision in *Gregory Marketing Corp. v. Wakefern Food Corp.*, 787 F.2d 92 (3d Cir.1986), Defendants contend, supports this conclusion. In *Gregory*, plaintiff served as a broker for a manufacturer of apple juice. The broker was compensated based upon a percentage of gross sales. At some point in time, the manufacturers began providing the defendant retailer special price discounts not available to other purchasers. The broker objected to the discounts as illegal, but the retailer declined to stop the discounts. Rather, the retailer directed plaintiff broker to fabricate a reason for the discount, in the event that any other purchasers inquired. When the broker refused to comply, the retailer terminated its brokerage agreement. *Gregory*, 787 F.2d at 92–93.

The broker commenced suit, alleging two injuries resulting from the alleged antitrust violations: (1) termination of the brokerage agreement resulted in loss of future commissions; and (2) the discounts afforded the retailer decreased the broker's commissions. *Id.* at 93. The district court dismissed the claim, holding that "the broker's injury did not flow from that which makes defendant's acts unlawful," and thus it "is not the type of injury that the antitrust laws were written to guard against." *Id.* (internal quotation marks and citations omitted). In so holding, the district court distinguished the decision rendered in *Ostrofe v. H.S. Crocker Co., Inc.*, 670 F.2d 1378 (9th Cir.1982), *vacated and remanded*, 460 U.S. 1007, 103 S.Ct. 1244, 75 L.Ed.2d 475 (1983), *on remand*, 740 F.2d 739 (9th Cir.1984), *cert. dismissed*, 469 U.S. 1200, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985) (allowing an antitrust suit by an employee forced to resign due to refusal to carry out a price fixing arrangement). The district court "suggested that an employee's injury is more closely linked to the antitrust violation than a broker's would be...." *Gregory*, 787 F.2d at 94.

The Third Circuit court affirmed the district court's conclusion, finding that the broker "is not an appropriate party to assert the claim set forth in the present lawsuit." *Id.* at 95. The antitrust violation alleged, the court noted, grows out of the pricing agreement between the manufacturer and the retailer. The lost future commissions, the court determined, did not flow from decreased competition in the apple market. *Id.* at 96. And while the reduced profit commission did result from the discount agreement, it "was not caused by the anticompetitive nature of that agreement." *Id.* Indeed, the court reasoned, the manufacturer could have reduced its prices for all buyers, thus reducing the broker's commissions, but there would have been no antitrust injury. *Id.* Moreover, the court concluded, the broker's participation "was not essential to carrying out the anticompetitive nature of the agreement." *Id.*

The Third Circuit court agreed with the district court that the *Ostrofe* decision was distinguishable, stating:

> [i]n that case, the Ninth Circuit permitted a suit alleging a Sherman Act violation to be brought by a former marketing director of a company who was discharged for refusing to carry out a bid-rigging scheme. That view has generally been rejected in similar cases by other courts. *See e.g., In re Industrial Gas Litigation*, 681 F.2d 514, 519 (7th Cir.1982), *cert. denied*, 460 U.S. 1016, 103 S.Ct. 1261, 75 L.Ed.2d 487. (1983); *McNulty v. Borden*, 542 F.Supp. 655 (E.D.Pa.1982); *Callahan v. Scott Paper Co.*, 541 F.Supp. 550 (E.D.Pa.1982). Contra *Shaw v. Russell Trucking Line, Inc.*, 542 F.Supp. 776 (W.D.Pa.1982). Even were we to adopt the Ninth Circuit rule as to employees, it would not affect the outcome here. Analogizing to *Blue Shield [of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982)]*, *Ostrofe II*, relied heavily on the fact that the marketing director was an "essential participant" in the price-fixing scheme, which "could not succeed without his active cooperation." *Ostrofe II*, 740 F.2d at 745–46. As noted above, however, this rationale is not applicable here since [the broker] was not essential to the ... agreement. Thus, *Ostrofe II* does not support

[the broker's] argument that it has sustained an injury.

*Id.* at 96–97.

Defendants interpret *Gregory* as precluding a finding of standing in this instance. Under *Gregory*, Defendants insist, Hughes did not suffer "the type of injury which the antitrust laws were designed to prevent."

Hughes disagrees with the Defendants' interpretation of *Gregory*. According to Hughes, standing was denied in *Gregory* because the broker did not play an integral role in the anticompetitive scheme. Here, Hughes contends that he did play an "essential role" in the anticompetitive scheme.

Additionally, Hughes insists, the Third Circuit court did not reject the rationale of *Ostrofe*, rather, it simply found the case to be factually distinguishable. Hughes contends that, unlike *Gregory*, the factual situation here is a "mirror image" of that in *Ostrofe*. Docket No. 15, p. 5.

I disagree with Hughes' contentions. First, in *Gregory*, the Third Circuit court recognized that the *Ostrofe* holding "has generally been rejected in similar cases by other courts," and thus, that it is an aberration. *See Gregory*, 787 F.2d at 96. I find this statement to be a clear indication of the Court's reluctance to embrace the *Ostrofe* decision. Indeed, the court simply gave no indication that it might embrace the *Ostrofe* holding in different factual circumstances. Interestingly, the United States District Court for the District of Maine reads the *Gregory* decision as "suggesting, without deciding, that the Third Circuit would deny standing to an employee claiming retaliatory discharge for refusal to violate the antitrust laws." *See Ashmore v. Northeast Petroleum Division of Cargill, Inc.*, 843 F.Supp. 759, 763 n. 8 (D.Me.1994).

Significantly, Hughes is unable to cite to a single Third Circuit court decision holding that an employee has standing to assert antitrust claims against his/her former employer for wrongful discharge. While research did disclose a district court decision granting standing, *Shaw v. Russell Trucking Line, Inc.*, 542 F.Supp. 776 (W.D.Pa.1982) (finding the *Ostrofe* decision to be persuasive), it was issued prior to the Third Circuit court's decision in *Gregory*. Moreover, it is at odds with two other district court opinions. *See Callahan v. Scott Paper Co.*, 541 F.Supp. 550 (E.D.Pa.1982) and *McNulty v. Borden, Inc.*, 542 F.Supp. 655 (E.D.Pa.1982).

Additionally, as noted by the Third Circuit court in *Gregory*, other circuits have rejected the *Ostrofe* analysis. *See In re Industrial Gas Antitrust Litigation*, 681 F.2d 514 (7th Cir.1982), *cert. denied*, 460 U.S. 1016, 103 S.Ct. 1261, 75 L.Ed.2d 487 (1983) (holding that a former corporate president who had been terminated from employment and blacklisted by the industry did not suffer an antitrust injury so as to give him standing); *Fallis v. Pendleton Woolen Mills, Inc.*, 866 F.2d 209 (6th Cir.1989) (denying antitrust standing to an employee who was allegedly terminated for refusal to participate in a vertical price fixing scheme); *O'Regan v. Arbitration Forums, Inc.*, 121 F.3d 1060, 1065 (7th Cir.1997) (stating that "an employee discharged for refusing to participate in an alleged antitrust violation has no standing to sue on the basis of that violation."); and *Gallant v. BOC Group*, 886 F.Supp. 202 (D.Mass.1995).

Denying standing to Hughes in this instance is consistent with the purpose of the antitrust laws. "[I]n fashioning the antitrust laws Congress was concerned with competition, not employee coercion or discharge." *Industrial Gas Litigation*, 681 F.2d at 519. In criticizing a decision granting standing to an employee, *Donahue v. Pendleton Woolen Mills, Inc.*, 633 F.Supp. 1423 (S.D.N.Y.1986), a commentator observed:

> no useful policy is served by granting standing to a terminated employee for a product market violation that is known to others. Thus the court in *Donahue* was wrong in granting standing to commission salesmen who were allegedly terminated because they objected to their employer's resale price maintenance scheme. In such a case the impact of the violation falls upon the dealers upon whom resale price maintenance is imposed, and they will know of the violation and have an incentive to sue.

Arceda & Hovenkamp, Antitrust Law, ¶ 338d (Supp.1986).

Consequently, for the reasons set forth above, I find that Hughes does not have standing to assert the claims set forth in Count One. Count One is, therefore, dismissed, with prejudice.

## (B) *Count Five—Fraudulent Misrepresentation*

■ Count Five purports to set forth a claim for fraudulent misrepresentation. Hughes essentially alleges that the Defendants promised that certain employment conditions and benefits would govern his employment, and that they would be reduced to writing. After commencing work, Hughes explains, Defendants presented to him a written contract not containing the promised terms and conditions. Hughes refused to sign the contract. The Defendants subsequently promised Hughes a termination package and reaffirmed their intention to honor the initially agreed upon conditions and benefits. Since his termination, however, and despite Hughes' repeated requests, Defendants have refused to honor their earlier promises.

The Defendants contend the action is untimely. Under Pennsylvania law, a cause of action for fraud or deceit must be commenced within two years. *See* 42 Pa.Cons. Stat.Ann. § 5524(7). A cause of action for fraud does not accrue, however, until "the fraud has been discovered by the exercise of due diligence." *Rothman v. Fillette*, 503 Pa. 259, 264–65 n. 3, 469 A.2d 543 (1983).

Defendants reason that "[b]y the exercise of reasonable diligence, Plaintiff must have discovered the alleged fraud no later than when 'Defendants ultimately presented Plaintiff with an employment agreement which contained terms contrary to those offered to induce Plaintiff's employment.'" Docket No. 8, p. 6–7 (*quoting* from the Complaint). The unsigned, written contract was, Defendants represent, received no later than February 15, 1985. Consequently, any claim must have been commenced on or before

approximately February 15, 1987—more than ten years before this action was actually commenced.

Hughes disputes that the statute commenced with the receipt of the written contract. Rather, the fraud was only discovered *after* termination. *See* Docket No. 15, p. 10. The terms of the written contract did not apprise Hughes of the fraud, he claims, because he had been working, and continued to work for the next eleven years, according to the terms initially agreed upon. *Id.* Indeed, Hughes maintains, he received yearly raises in salary, yearly bonuses, and vacations. *Id.* Thus, it was not until his employment was terminated, that he learned that the Defendants would not honor earlier commitments concerning such items as a non-compete clause.

Hughes' argument fails, however, in that the Complaint does not contain allegations that he worked under the terms to which he claims the parties agreed.[4] As the Complaint currently reads, it may fairly be inferred that Hughes learned, or should have learned through the exercise of reasonable diligence, that the Defendants would not honor their earlier commitments, when he received the written employment contract in 1985. Consequently, this action should have been commenced by 1987.

Accordingly, the Defendants' Motion to Dismiss the claim for fraudulent misrepresentation in Count 5, to the extent that it pertains to Hughes' hiring, is granted and the claim is dismissed.[5] Such dismissal is, however, without prejudice to file a Second Amended Complaint curing these deficiencies.

## (C) *Count Seven—Defamation*

■ Count Seven purports to set forth a cause of action for defamation. Hughes contends that "Fisher's public declarations that Plaintiff was being terminated because Plain-

---

**4.** Hughes cites to paragraphs 25–31 of the Complaint in support of his contentions that he actually worked according to the conditions and benefits to which the parties initially agreed. Paragraphs 25 – 31 do not, however, contain any such suggestions.

**5.** Given this dismissal, I need not address the Defendants' contentions pertaining to the Motion for a More Definite Statement.

tiff 'flunked the psychological exam' was defamatory *per se.*" Complaint, ¶ 143. Hughes adds that "[t]he simple act of terminating Plaintiff, when he had long enjoyed the reputation as being the best in the international underground mining industry, was defamation *per se* as it lowered him in the estimation of his international professional community." Complaint, ¶ 149. Finally, Hughes alleges that "[p]ublication of defamatory *per se* statements implying Plaintiff's lack of psychological stability and/or Plaintiff's dishonesty, further harmed Plaintiff's reputation throughout the international underground mining industry." Complaint, ¶ 150.

Defendants seek the dismissal of Count Seven as untimely. A cause of action for defamation is governed by a one year statute of limitations. *See* 42 Pa.Cons.Stat.Ann. § 5523(1). Defendants reason that:

> the phrase "that Plaintiff was being terminated" (as opposed to "had been terminated") indicates that statement must have been spoken—if at all—contemporaneously with that termination. Plaintiff was terminated on July 31, 1995. Complaint ¶ 59. Accordingly, the statement was made far beyond the one-year limitations period, and Count Seven must be dismissed.

Docket No. 8, p. 8–9.

Hughes responds as follows:

> [i]t matters not when the statement was spoken if Plaintiff can establish that *publication* to third parties was made within one year of filing suit.... Publication to third parties is one of seven elements comprising a defamation claim and if Defendants continue to relate defamatory statements to third parties, a new cause of action is created each time.... Plaintiff, in Count Seven, *alleges ongoing publication and will, with discovery, be able to prove it to a certainty.*

Docket No. 15, p. 10–11 (emphasis added).

Contrary to Hughes' contentions, however, the Complaint does not allege "ongoing publication." *See* Complaint, ¶¶ 142–152. Indeed, the Complaint is somewhat deficient in

identifying the periods of time in which the defamatory statements were published. The only reference as to when the alleged defamatory remarks were made is, as Defendants allege, that Hughes "was being terminated." The fair inference from this allegation is, as Defendants allege, that the defamatory remarks were made at the time of the termination, and more than one year before this action was commenced. Consequently, the claim is untimely.

Defendants' Motion to Dismiss Count Seven is, therefore, granted. The dismissal is, however, without prejudice to amend the Complaint to cure the above-noted deficiencies.

### (D) *Count Eight—Antitrust Violations*

■ Hughes purports to set forth another antitrust claim in Count Eight. Whereas Count One is predicated upon Hughes' wrongful termination, Count Eight is based upon the Defendants' alleged conspiracy to "eliminate Plaintiff['s] ability to compete in the longwall mining industry," by discontinuing his severance benefits and by engaging in a defamation campaign against him. *See* Complaint, ¶¶ 157, 159, 161.[6]

Defendants characterize Count Eight as deficient in that it does not contain allegations of injury to the marketplace. The Defendants cite to a decision rendered in *Baglio v. Baska,* 940 F.Supp. 819, 828 (W.D.Pa. 1996), *aff'd,* 116 F.3d 467 (3d Cir.1997), for the proposition that "[a]n antitrust plaintiff must prove that [the] challenged conduct affected the prices, quantity or quality of goods or services, not just his own welfare." (*See* Docket No. 19, p. 5). Count Eight, Defendants maintain, alleges only a conspiracy to eliminate Hughes' ability to secure employment in the industry, rather than a bid-rigging conspiracy.

Hughes does not disagree with the Defendants' interpretation of *Baglio. See* Docket No. 13, p. 7 (stating that "Plaintiff easily meets and at this time expresses no argument with the *Baglio* test of having to 'prove that challenged conduct affected prices,

---

**6.** Neither party addresses the impact, if any, upon Count Eight, of my dismissal of the anti-

trust claim asserted in Count One, for lack of standing.

quantity or quality of goods or services, not just his own welfare.' "). According to Hughes, the allegations set forth earlier in the Complaint concerning the bid-rigging, are sufficient to satisfy the *Baglio* test.

I do not, however, find the allegations to be sufficient. Count One addressed a bid-rigging conspiracy. Such a conspiracy would have an obvious effect upon the marketplace. Count Eight recounts an entirely different conspiracy—one to punish Hughes. Indeed, Hughes takes pains to distinguish between the conspiracies. *See* Docket no. 13, p. 7 (stating that two separate conspiracies existed: "one to restrain trade and one to injure Plaintiff directly"). Hughes' employment termination and blacklisting from the industry have no obvious, nor alleged, effect upon the marketplace. While Hughes insists that he has demonstrated "the effect on *his* welfare," (*see* Docket No. 13, p. 7) (emphasis added), it is the absence of an effect upon the marketplace which mandates the dismissal of this claim. Accordingly, Count Eight is dismissed, with prejudice.

### (E) *Count Nine—Prima Facie Tort*

■ In Count Nine, Hughes purports to assert a claim entitled "prima facie tort." *See* Complaint, ¶¶ 171–172. Relying upon the decision rendered in *Charles Shaid of Pennsylvania, Inc. v. George Hyman Constr. Co.,* 947 F.Supp. 844 (E.D.Pa.1996), the Defendants contend that "Pennsylvania does not recognize 'prima facie tort' as a cause of action." Docket No. 8, p. 9.

In *Shaid,* after conducting exhaustive research, the district court determined that "[w]hile the Third Circuit and the Pennsylvania Supreme Court have never recognized a cause of action for prima facie tort, neither has either court ever expressly rejected such a claim." *Shaid,* 947 F.Supp. at 852. Predicting whether the Pennsylvania Supreme Court would, in fact, recognize such a claim, the district court determined that it would not. The court stated:

[n]o plaintiff bringing suit under Pennsylvania law has ever recovered under a theo-

ry of prima facie tort. No Pennsylvania court or court interpreting Pennsylvania law has ever stated that, in Pennsylvania, prima facie tort is a valid cause of action. After canvassing the authorities and forecasting how the Pennsylvania Supreme Court would apply Pennsylvania public policy and balance the social utility of adopting section 870 of the Restatement (Second) against the social costs, the Court concludes that if presented with a claim for prima facie tort, the Pennsylvania Supreme Court would not recognize such a cause of action under Pennsylvania law.

*Id.,* at 855–56. *See also Collier by Collier v. William Penn School District,* 956 F.Supp. 1209, 1217 (E.D.Pa.1997) (stating that "[a] recent decision in this district determined that the Pennsylvania Supreme Court would not recognize a cause of action for prima facie tort. *Charles Shaid of Pennsylvania, Inc. v. George Hyman Construction Co.,* 947 F.Supp. 844, 856 (E.D.Pa.1996). We agree.").

Hughes fails entirely to acknowledge the *Collier* decision and, as to *Shaid,* states simply that:

[a]lthough *Shaid* is clearly speaking to a situation where the "*injury* does not consist entirely of economic damages" and the Defendant is just as clearly speaking to Plaintiff "*seeking* only economic damages" (Apples and Oranges), Plaintiff can only respond by again pointing out that economic damage is only one of Plaintiff's injuries.

Docket No. 15, p. 14 (emphasis in original).

I am not sure that I understand Hughes' argument. To the extent that Hughes argues the *Shaid* holding was limited to instances where plaintiff asserts only economic damages, I disagree. The excerpt from the opinion set forth above does not indicate any such limitation.[7] Nor did the *Collier* court acknowledge any such limitation.

Because I agree with the *Shaid* and *Collier* courts that Pennsylvania law does not recognize a cause of action for prima facie

---

**7.** The *Shaid* court did, however, state that, in the alternative, should the Pennsylvania Supreme Court recognize such a claim, it certainly would

not do so where the only injury consists of economic damages.

tort, the Defendants' Motion is granted in this regard. Count Nine is dismissed, with prejudice.

### (F) *Count Ten—RICO Violations*

■ Count Ten purports to set forth a RICO claim predicated upon five underlying schemes: (1) defrauding Hughes concerning application of a covenant not to compete; (2) tax evasion; (3) a "tying" arrangement; (4) bid-rigging; and (5) conspiracy to terminate Hughes' employment and severance package. The Defendants maintain that the Complaint fails to allege a "pattern" of racketeering activity.

■ "[T]o prove a pattern of racketeering activity a plaintiff must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989) (emphasis in original). Consequently, a plaintiff must show both "relatedness" and "continuity." *Tabas v. Tabas*, 47 F.3d 1280, 1292 (3d Cir. 1995), *cert. denied*, 515 U.S. 1118, 115 S.Ct. 2269, 132 L.Ed.2d 275 (1995).

■ Under the first inquiry, predicate acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J. Inc.*, 492 U.S. at 239, 109 S.Ct. 2893 (citations omitted).

"As to the second, or 'continuity,' prong of the analysis, the Court in *H.J. Inc.* attempted to promulgate a somewhat flexible approach, based upon a 'commonsense, everyday understanding of RICO's language and Congress' gloss on it.' " *Tabas*, 47 F.3d at 1292, *quoting*, *H.J. Inc.*, 492 U.S. at 241, 109 S.Ct. 2893. Based upon this approach, the Court determined that "[w]hat a plaintiff or prosecutor must prove is continuity of racketeering activity, or its threat, *simpliciter.*" *H.J. Inc.*, 492 U.S. at 241, 109 S.Ct. 2893.

While the Defendants challenge both the "relatedness" and "continuity" of the predicate acts, I need only address their contentions regarding "relatedness." The predicate

acts do not, the Defendants contend, have the same victims. The covenant not to compete scheme and the termination scheme were directed towards Hughes. The tax evasion victimized the United States government. The tying arrangement, the Defendants maintain, "was directed at the 'general public' for the purpose of reducing the taxable income of the Defendant Millcraft." Docket No. 8, p. 12. Finally, the bid-rigging scheme was directed towards "Cyprus Emerald and the general public for the purpose of ensuring that Defendant Westfalia was awarded the Cyprus Emerald job." *Id.*

Hughes offers no substantive argument in response. For instance, Hughes does not contend that the predicate acts had similar results, participants, victims, or methods of commission, or were somehow related in another way. Indeed, such an argument would likely be fruitless.

For instance, the predicate acts had different results, just as they had different purposes. Accepting as true the facts alleged in the Complaint, the first scheme was designed to secure Hughes' employment. The second and third schemes were crafted to avoid unwanted tax consequences. The fourth scheme apparently was enacted to secure the Cyprus Emerald job. Finally, the purpose of the fifth scheme presumably was to punish Hughes. The "results" of the schemes are also different, and mirror the diverse purposes.

I acknowledge that, accepting as true the facts alleged in the Complaint, each scheme shared a method of commission—mail and wire fraud. Yet I do not believe that this mere shared method of commission is sufficient to render the predicate acts "related." *See Vild v. Visconsi*, 956 F.2d 560, 567 (6th Cir.1992), *cert. denied*, 506 U.S. 832, 113 S.Ct. 99, 121 L.Ed.2d 59 (1992) (stating that "[a] mere allegation that the defendants used wire and mail fraud in two otherwise dissimilar schemes does not, under the circumstances, satisfy the relationship prong of the pattern test.").

Furthermore, the fact that some of the schemes involved the same participants, does not mandate a finding of relatedness. *See*

*Owens v. Wade,* 789 F.Supp. 168, 173–74 (E.D.Pa.1992) (rejecting a claim of relatedness where the schemes involved the same participants, but with different purposes.).

In summary, the dissimilarity among the predicate acts pertaining to the purposes, results, participants, victims and methods of commission, convinces me that the schemes are not related. Given this dissimilarity, Hughes is unable to establish each element necessary to prevail upon a RICO claim. In light of such a deficiency, Count Ten is dismissed, with prejudice.

(G) *Counts Eleven and Twelve—Attorney's Fees and Punitive Damages*

In Counts Eleven and Twelve, Hughes seeks to recover attorney's fees and punitive damages. The Defendants counter that Pennsylvania law does not recognize independent causes of action for attorney's fees and punitive damages.

Hughes responds as follows:

[a]s to Defendants' claims that Plaintiff is asserting an independent cause of action for attorneys fees and punitive damages, he simply is not. In this regard, Plaintiff will agree to place his request for such fees and damages in his prayer for relief, voluntarily, should this Honorable Court require same.

Docket No. 15, p. 15.

From this exchange, it appears that Hughes does not intend to assert "independent causes of action" for attorney's fees and punitive damages. Rather than require Hughes to file a Second Amended Complaint, I will simply treat the surviving counts as including, where appropriate, claims for attorney's fees and punitive damages. Consequently, Defendants' Motion is denied as moot insofar as it seeks the dismissal of Counts Eleven and Twelve.

If, however, Hughes does file a Second Amended Complaint in order to reassert those claims dismissed without prejudice, he should delete Counts Eleven and Twelve, and simply include requests for attorney's fees and punitive damages where appropriate in the Second Amended Complaint.